IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REVEREND DAVID LOUIS,<br><br>    Plaintiff,<br><br>vs.<br><br>PENNSYLVANIA ADULT AND<br>TEEN CHALLENGE,<br><br>    Defendant. | Civil Action No.:<br><br>Judge: 2:23-cv-1447<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Reverend David Louis, by undersigned counsel, files this action upon the grounds set forth below.

**I.    Jurisdiction and Venue**

1. The jurisdiction of this Court is invoked pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. 1367(a). This Court is an appropriate venue because the Defendant has a residence in the Western District of Pennsylvania and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**II.    Parties**

2. Reverend David Louis is an adult person who resides in the Western District of Pennsylvania. Reverend Louis worked for Defendant for 17 years, and was most recently employed as the Executive Director of Defendant's facility in Cheswick, Pennsylvania.

3. Defendant Pennsylvania Adult and Teen Challenge ("PAATC") is a domestic non-profit corporation organized under the laws of the Commonwealth of Pennsylvania. It maintains its principal place of business at 33 Teen Challenge Road, Rehrersburg, Pennsylvania 19550, and a satellite center at 220 Challenge Lane, Cheswick, Pennsylvania, 15024.

**III.     Facts**

4. PAATC offers faith-based, comprehensive addiction treatment programs to men and women.

5. PAATC is the home of a faith-based recovery program where lives are changed.

6. PAATC believes that through a relationship with Jesus Christ, there is the hope of recovery for everyone struggling with substance use disorders and dependency issues.

7. PAATC offers a safe place for recovery, one that is based on the solid foundation of the teachings of Christ.

8. PAATC wants its program participants to experience the love of Jesus Christ, grow in their understanding of God, and progress in their relationship with Him.

9. PAATC wants to provide its program participants every opportunity to come to a saving knowledge of Christ.

10. Indeed, the heart of who PAATC is and what it does is centered on Christ and built on His unconditional love.

11. PAATC understands that all fall short of the glory of God and are in need of salvation.  It believes that all persons are made whole in God, and offers that as the hope to all those who enter its doors seeking another chance at life.

12. PAATC uses its religious status, values and mission to maintain tax-exempt status under 29 U.S.C. § 501(c)(3).

13. PAATC does not pay federal or state income taxes.

14. PAATC earns significant revenue from services billed to Pennsylvania's Medical Assistance (MA) program (Medicaid).

15. Medicaid is a jointly funded federal/state program.

16. In 2022, the federal government and Pennsylvania spent approximately $33 Billion on Medicaid.

17. In Pennsylvania, MA members receive physical and behavioral care through managed care organizations.

18. Pennsylvania's managed care programs for Medical Assistance are known collectively as HealthChoices.

19. HealthChoices members are assigned a Behavioral Health Managed Care Organization (BH-MCO) based on their county of residence.

20. The counties of Adams, Allegheny, Bedford, Bradford, Berks, Blair, Cameron, Carbon, Centre, Chester, Clarion, Clearfield, Clinton, Columbia, Delaware, Elk, Erie, Forest, Greene, Huntingdon, Jefferson, Juniata, Lackawanna, Luzerne, Lycoming, McKean, Mifflin, Montour, Monroe, Northumberland, Pike, Potter, Schuylkill, Snyder, Sullivan, Somerset, Susquehanna, Tioga, Union, Warren, Wayne, Wyoming and York are all served by the BH-MCO known as Community Care Behavioral Health Organization (CCBHO).

21. CCBHO is a UPMC-affiliated, nonprofit behavioral health insurance organization under contract with and substantially subsidized by the Commonwealth of Pennsylvania's MA program.

22. CCBHO functions as an agent of the Commonwealth with respect to the provision of behavioral health services to MA members, and with respect to ensuring that behavioral health service providers comply with Medicaid rules and regulations.

23. On or about April 21, 2023, PAATC received the results of four Fraud, Waste and Abuse audits conducted by CCBHO on PAATC's outpatient Medicaid billings during the period from April 1, 2022 through June 30, 2022 on the Berks County contract.

24. The audit was conducted by Community Care's Program Integrity/Fraud, Waste and Abuse (FWA) Special Investigations Unit (SIU) pursuant to its policy to detect, deter and prevent misuse of Medical Assistance funds in behavioral healthcare.

25. The audits found dozens of instances of waste, fraud and abuse at PAATC.

26. These included, by way of illustration only, PAATC:

   a. Billing Medicaid for non-reimbursable breaks in service,

   b. Billing Medicaid for non-reimbursable religious services,

   c. Billing Medicaid for non-reimbursable leisure and administrative activities,

   d. Billing Medicaid for non-reimbursable services where the provider was not qualified to render the service,

   e. Billing Medicaid for services not rendered,

   f. Billing Medicaid for non-reimbursable services provided at non-compliant group sessions,

   g. Billing Medicaid for non-reimbursable services provided by "interns" who were program participants and who PAATC was using to provide care for other program participants,

   h. Billing Medicaid using incorrect codes, and,

   i. Billing Medicaid for non-reimbursable Buprenorphine (Suboxone) Maintenance where treatment service requirements were not met.

27. As a result of the CCBHO audits, PAATC was required to reimburse CCBHO approximately $472,000 in Medicaid overpayments, and to institute more than 100 corrective action plans.

28. As CCBHO pointed out in its audit report, CCBHO had raised many of the same concerns with PAATC during a training session provided to PAATC in June 2018. It wrote:

> [O]n 06/13/2018, the Community Care SIU conducted an onsite training for Teen Challenge leadership and staff on your

4

>Rehrersburg campus. This session was also attended by representation from the Berks County Department of Human Services. The content of the training included federal, and state laws and regulations as well as HealthChoices and Community Care requirements including those related to FWA as well as those associated with the delivery of compensable substance abuse services. Many of the deficiencies identified in this audit had been addressed with you during the training.

29. Based on his interactions with PAATC executive leadership, including President and CEO Kris McFadden, Reverend Louis was concerned PAATC leaders were not taking CCBHO's audit findings seriously and regarded them mostly as errors in paperwork. He feared that PAATC intended to continue the same illicit billing practices uncovered in the audits, but camouflage them behind changes in verbiage in invoices and patient files to make PAATC's claims to Medicaid look legitimate.

30. Consequently, on April 26, 2003, Reverend Louis emailed a letter to PAATC Board Chairman Ronald Blevins in which Reverend Louis wrote in pertinent part:

>[T]his letter is triggered by the audit results and the communication sent by Community Care Behavioral Health dated April 21, 2023 and the seriousness of it and I do not believe that the leadership understands this.
>
>[I]t is my opinion that the President/CEO and the VP leadership team are not understanding the gravity of the situation of this CCBH audit dated 4-21-23 and the serious threat it poses to the organization of which you are the stewards. After several attempts to make this clear to the VPs and to Kris himself, I am compelled to write this letter to you and the board because I do not believe that the seriousness of this situation is being understood by the leadership.
>
>Suffice to say, they are asking for close to $500,000 back from services we billed for and they are now watching us like a hawk. They are asking for 108 separate Corrective actions plans across the organization. They are also considering putting us on what is called a "Fraud/Waste/Abuse Prepayment Claims Hold", which means that we will not be submitting for reimbursements by batch, but each and every billable service must be submitted individually

5

> with the corresponding documentation to demonstrate compliance. If this is not done to their satisfaction, and we continue to violate their policies, this could result in a FULL Fraud Waste Abuse Audit, and be turned over to the larger State Medicaid Fraud Control Section.
>
> I am alerting you to this reality because I don't believe the implications of this audit and massive impact it will have on budgeted revenue moving into the 2023-2024 budgeting process is being taken seriously by the leadership.
>
> [I] truly believe that this event is God's call to us that we, and I emphasize myself in that WE, have compromised our program for the sake of insurance $$$ to the point that we have to pull back. We have enriched ourselves on the mammon of the world and God is sending his judgments upon us. If we don't repent and turn back, He will further devastate PAATC financially.

31. CEO McFadden learned of Reverend Louis's letter the same day. He called Reverend Louis that afternoon, asked what was going on and whether Reverend Louis had sent his letter to the entire Board.

32. Reverend Louis explained his concerns to McFadden, to which McFadden responded in sum or substance "That's interesting," and then abruptly hung up the phone.

33. Thereafter, McFadden did not speak with Reverend Louis for nearly two weeks.

34. On May 10, 2023, McFadden and PAATC Human Resources Director Heather Powell called Reverend Louis and fired him.

35. During the call, McFadden specifically referenced the letter that Reverend Louis had sent to Chairman Blevins and said that it had shocked McFadden. McFadden faulted Reverend Louis for sending the letter rather than calling McFadden first. He then said that PAATC and Reverend Louis were "traveling different paths," and that as a result, PAATC was terminating Reverend Louis's employment.

36. PAATC sent Reverend Louis a termination letter dated May 11, 2023 stating that Reverend Louis was terminated "due to philosophical differences regarding the vision of the organization."

37. Prior to his abrupt termination, PAATC had never mentioned that Reverend Louis was "traveling [a] different path" from the organization, or that it perceived any "philosophical differences" with him.

38. Indeed, in Reverend Louis's most recent written performance evaluation, PAATC said Reverend Louis was a "great leader" who "support[ed] the strategic mission of the organization." PAATC said that Reverend Louis "Meets All Expectations" regarding "model[ing] the organization's values and mission to the staff, board, funders, donors and the community," "lead[ing] departmental staff in maintaining a climate of excellence, accountability and respect," and "shar[ing] PAATC['s] vision."

39. The reasons that PAATC articulated orally and in writing to Reverend Louis for his termination are pretexts for retaliation.

40. After firing him, PAATC sent Reverend Louis an unsolicited Settlement Agreement and General Release asking him to release his legal claims, maintain everything he knew about PAATC in confidence, and to not disparage PAATC in any way.

41. Reverend Louis did not sign it.

**Count I**
**False Claims Act**
**31 U.S.C. § 3730(h)**
**Retaliation**

42. Plaintiff incorporates by reference the allegations above as if fully restated herein.

43. Plaintiff's activities as alleged above were efforts to stop violations of the federal False Claims Act, and as such were protected activities.

44. PAATC was aware of Plaintiff's protected activities.

45. PAATC discharged Plaintiff because of his protected activities.

46. As the direct, proximate and intended result of Defendant's termination of Plaintiff's employment, Plaintiff has sustained financial and personal injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant and the following legal and equitable remedies:

a. Double back pay and benefits,

b. Interest on back pay and benefits,

c. Compensation for special damages including mental anguish, grief and distress,

d. Reinstatement,

e. Front pay and benefits if reinstatement is not feasible,

f. Litigation costs,

g. Reasonable attorney fees,

h. An upward adjustment to compensate Plaintiff for adverse tax consequences, and,

i. Such further legal and equitable relief as the Court may deem just and proper.

## Count II
## Pennsylvania Whistleblower Law (PWL)
## 43 P.S. §§ 1421-1428
## <u>Retaliation</u>

47. Plaintiff incorporates by reference the allegations above as if fully restated herein.

48. Defendant is a public body and/or employer as defined by the PWL because it receives reimbursement from the Medicaid program, and/or because it receives Medicaid money from CCBHO in exchange for the provision of services.[1]

49. Plaintiff in good faith reported wrongdoing or waste to the Chairman of the Board, of which CEO McFadden was aware.

50. PAATC fired Plaintiff because of his good faith report of wrongdoing or waste to the Board Chairman.

51. As the direct, proximate and intended result of Defendant's termination of Plaintiff's employment, Plaintiff has sustained financial and personal injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant and the following legal and equitable remedies:

    a. Back pay and benefits,

    b. Reinstatement with full fringe benefits and seniority,

    c. Front pay and benefits if reinstatement is not feasible,

    d. Actual damages,

---

[1] *Waller v. Habilitation Grp., LLC*, No. 2:21-CV-00519-CCW, 2022 U.S. Dist. LEXIS 211162 *22 (W.D. Pa. Nov. 22, 2022); *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 476 n.8 (Pa. Super. 2017); *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 576 (Pa. Super. 1999); Langoussis v. Easton Hosp., 61 Pa. D. & C.4th 176, 181 (C.P. 2002) ("Defendant, Easton Hospital, is a private hospital that receives Medicaid funding. Following *Denton,* defendant constitutes a "public body" for purposes of the Pennsylvania Whistleblower Law.").

9

    e.    Litigation costs,

    f.    Reasonable attorney fees,

    g.    An upward adjustment to compensate Plaintiff for adverse tax consequences, and,

    h.    Such further legal and equitable relief as the Court may deem just and proper.

### Count III
### Pennsylvania Common Law
### <u>Wrongful Discharge</u>

52.    Plaintiff incorporates by reference the allegations above as if fully restated herein.

53.    Plaintiff sets forth this Count in addition to Count II as permitted by *Denton v. Silver Stream Nursing & Rehab. Ctr.,* 739 A.2d 571, 577 (Pa. Super. 1999) and *Aiken v. Living Indep. for the Elderly-Pittsburgh, Inc.*, No. GD 14-015284, 2015 Pa. Dist. & Cnty. Dec. LEXIS 16588, at *7 (C.P. Apr. 24, 2015).  In the event that PAATC is found not to be an employer within the meaning of the PWL, Plaintiff sets forth this Count in the alternative to Count II.

54.    The PWL represents the "Commonwealth's public policy, as clearly enunciated by the legislature, that persons who report waste or wrongdoing regarding public funds should not be penalized by losing their jobs."  *Denton,* 739 A.2d 571 at 577.

55.    Defendant terminated Plaintiff because he reported waste or wrongdoing regarding public funds.

56.    If employers are permitted to terminate employees who report waste or wrongdoing regarding public funds, the public policy of Pennsylvania will be undermined.

57.    Defendant terminated Plaintiff maliciously and/or in reckless disregard of the public policies of this Commonwealth.

58.    As the direct, proximate, foreseeable and intended result of the termination of his employment, Plaintiff has suffered financial and personal injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant and the following legal and equitable remedies:

    a.    Back pay and benefits;

    b.    Front pay and benefits;

    c.    Compensatory damages for grief, anxiety, mental anguish and distress;

    d.    Punitive damages;

    e.    Pre-and post-judgment interest;

    f.    Costs of suit;

    g.    An upward adjustment to compensate for the adverse tax consequences of a lump sum award; and,

    h.    Such other relief as the Court finds just and proper.

Respectfully submitted,

*/s/ Charles A. Lamberton*

Charles A. Lamberton, Esq.
Pa. I.D. No. 78043
Lamberton Law Firm, LLC
707 Grant Street
Gulf Tower, Suite 1705
Pittsburgh, PA  15219
412-258-2250
cal@lambertonlaw.com

Counsel for Plaintiff

11